Junior Amusement Co. v. Commissioner.
Junior Amusement Co. v. Commissioner
Docket No. 49684.
United States Tax Court
T.C. Memo 1956-115; 1956 Tax Ct. Memo LEXIS 181; 15 T.C.M. (CCH) 577; T.C.M. (RIA) 56115; May 10, 1956
*181 M. C. Delle, Esq., and Winfield G. Boyd, C.P.A., Box 408, Yakima, Wash., for the petitioner. Gordon N. Cromwell, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined a deficiency in income tax against petitioner, Junior Amusement Co., for the taxable year 1949 in the amount of $19,106.75. By its pleading, petitioner asserts an overpayment of income tax for the same year in the amount of $8,665.58. The sole issue for our decision is the fair market value of the capital stock of Yakima Community Hotel, Inc., received by petitioner in exchange for property July 29, 1949. Findings of Fact Stipulated facts are so found. The petitioner is a Washington corporation formed in 1926 by Frederick Mercy with its principal office at Yakima, Washington. Its capital stock has always been held by members of the Mercy family. Its books and records have been maintained upon an accrual accounting system. Its corporation income tax return for the taxable year 1949 was filed with the collector for the district of Washington. Frederick Mercy died in July 1948 and Frederick Mercy, Jr., his son, has since been president *182 of petitioner. On August 14, 1946, petitioner purchased a partially constructed 13-story building in Yakima known as the Naches Hotel, which was located upon four lots in the central business district of that city. In the same month, it also purchased property known as the Robertson Building located upon two lots adjoining the Naches Hotel. Petitioner's books reflect a purchase cost of $102,868.34 for the Naches Hotel building and $51,434.17 for the land occupied by it. The cost of the Robertson building and land is there reflected in the amounts of $15,060.14 and $20,360.84, respectively. In 1946, petitioner made improvements on the hotel building at a cost of $46,738.43; in 1947, improvements were made amounting to $18,884.70; and, in 1947 and 1948, additional improvement expenditures were made in the amount of $271,624.27, which largely represented the cost of sheathing the entire exterior of the building in aluminum and placing window frames and glass in all windows. As of July 29, 1949, the total cost basis of the hotel building in petitioner's hands was $491,549.91. Improvements at a cost of $830.27 were made on the Robertson building by petitioner in 1948, making its total *183 cost basis on the valuation date $36,251.25. The hotel building had been constructed to the extent of the steel framework and concrete exterior approximately 17 years prior to its acquisition by petitioner as a community project, which took the form of a public subscription to the stock of a corporation organized for the building and operation of a completed hotel. The project failed before the structure could be completed because of a lack of sufficient funds and the building remained in that condition until the improvements made by petitioner, and was not completed until subsequent to July 29, 1949, when it was purchased from petitioner by Yakima Community Hotel, Inc., hereinafter referred to as Community. The unfinished hotel structure aroused considerable public dissatisfaction because of its unsightliness, which it was felt by citizens of Yakima detracted from the general growth and well-being of the city. It was also apparent to members of the Chamber of Commerce and business operators generally that the city was in need of a first class modern hotel commensurate with its population, which was, in July 1949, about 38,000. Because of these circumstances, Community was organized *184 and became effective as a corporation July 8, 1949. It was capitalized at $1,700,000, which was represented by 17,000 shares of $100 par value capital stock. The primary promoter of Community and the chief source of aid in the sale of its stock was the Yakima Chamber of Commerce and business people of the city. The stock was offered for sale to prospective subscribers not as an investment in Community alone but also as an investment in a community project. The promoters of Community had acquired a 90-day option to purchase the hotel property and the Robertson property from petitioner on May 13, 1949. The option fixed the total price for both properties at $555,000, payable as follows: assumption of a mortgage then encumbering the premises, the issuance to petitioner of 2,000 shares of $100 par value stock of a corporation (Community) to be formed for the construction and operation of a hotel, and the remainder in cash or notes of the proposed corporation. An active campaign for subscription to the stock of the proposed corporation was thereupon begun and carried on largely through the management of a promotion concern, the services of which had been obtained through the Yakima Chamber *185 of Commerce. The campaign resulted in the subscription of 10,491 shares of stock by 1,867 persons, firms or corporations by July 29, 1949, approximately 1,221 subscribers having agreed to purchase one share of stock each, 191 having subscribed for 10 shares or over but less than 100 shares, 23 having subscribed for more than 100 shares, and approximately 432 having subscribed for from 2 to 9 shares. Petitioner, through its president, had subscribed first for 200 shres and later for 2,000 shares of such stock. On June 14, 1949, petitioner executed a written agreement, subsequently, but before July 29, 1949, signed by 25 other subscribers for more than 10,000 shares, that the stock issued to such subscribers would not be offered for sale by them for a period of 5 years from the date of issuance thereof. One of the purposes underlying the restriction agreement was to assure prospective subscribers that there would be a continuing interest for at least 5 years on the part of the major stockholders who represented those whose business reputations and experience in the city of Yakima were best adapted to bring about the completion and ultimate success of the hotel project. Petitioner, *186 through its president, Frederick Mercy, Jr., was the operator of the Commercial Hotel, which was the leading hotel in Yakima prior to and during 1949. Petitioner's president shortly after the incorporation of Community became and still is a member of its board of directors. The stock subscription campaign was sufficiently successful to permit the exercise of the option on July 29, 1949. On that date, both of the premises covered thereby were conveyed to Community. The purchase price was paid by Community, in the amount fixed by the option, by the assumption by the grantee of a mortgage liability in the amount of $216,780.70, by its check for $108,219.30, by its promissory note for $30,000, and the issuance and delivery to petitioner of 2,000 shares of its $100 par value stock. The deed by which the property was conveyed bore Federal and State revenue stamps in sufficient total amount in each instance to represent the respective revenues imposed by law upon a transfer of an equity in real estate of $555,000, less a mortgage encumbrance of $216,780.70. Petitioner has reported no gain on the sale of the property here involved. In its 1949 corporation return, it valued the 2,000 shares *187 of Community stock at $62.31386 per share, added its total valuation of the stock, $124,627.72, to the amount of $351,483.15, which is reported as "cash," resulting in a total sales price of $476,110.87, which is equal to petitioner's total adjusted cost basis of the properties sold. On the valuation date, the ensuing time necessary to have plans completed and the hotel completed and equipped for business operation was approximately 18 months. Assuming all subscribers to Community stock were to pay the price of stock for which they subscribed, the remaining amount necessary for the completion and equipment of the hotel would have been about $1,000,000. After its acquisition of the real properties here involved, as of July 29, 1949, the financial position of Community was as follows: CURRENT ASSETS: Cash in bank
$ 4,378.07
Stock subscriptions receivable
687,145.40
Returned checks
40.00
TOTAL CURRENT ASSETS
$ 691,563.47
FIXED ASSETS: Land and buildings
$ 555,000.00
Organization expense
48,364.73
Prepaid taxes
962.50
604,327.23
TOTAL ASSETS
$1,295,890.70
LIABILITIES AND CAPITAL: Miscellaneous taxes withheld
$ 10.00
Note to Junior Amusement
Co.
30,000.00
Mortgage on land and build-
ings
216,780.70
Capital stock subscribed but
unissued
1,049,100.00
TOTAL LIABILITIES AND
CAPITAL
$1,295,890.70
*188 In determining the deficiency involved here the respondent determined that the fair market value on July 29, 1949, of the 2,000 shares of stock in Community received by petitioner on that date was $100 a share. The fair market value on July 29, 1949, of the stock of Community in the hands of petitioner was not in excess of $50 per share. Opinion Respondent rests his determination of value squarely upon the proposition that the best evidence of the value of Community stock on the valuation date, July 29, 1949, is the price at which it was subscribed by 1,867 subscribers at or shortly prior to that date. In its amended petition, petitioner takes the position that the stock had no valuation in excess of $50 per share at the time it received 2,000 shares in part payment for the Naches Hotel and Robertson properties. It so contends primarily because petitioner was one of 26 stock subscribers who executed a written restrictive agreement prior to that date prohibiting the sale of Community stock by any of them for a period of 5 years. It further contends that the subscription sales of the stock at its par value of $100 per share are not indicative of the true fair market value thereof *189 for the reason that the stock was not offered for sale nor purchased on the basis that it was more than a contribution to a civic project; that the prospective profits of Community were speculative to the point where the profit motive of purchasers must be greatly discounted. It seems clearly apparent to us that, at least with respect to those subscribers to more than a nominal number of shares, their motivation for so doing was primarily profit to be realized from the completion and operation of the Naches Hotel. In ordinary circumstances, even though stock to be evaluated is that of a new and as yet non-operational corporation, contemporary sales or subscriptions constitute the best evidence of its fair market value. ; . However, the circumstances with which we are here faced were not ordinary for the reason that no sale of petitioner's stock could be made for approximately 5 years subsequent to the date of its acquisition due to binding commitments made by petitioner and other major subscribers to that effect. While not conclusive to the effect such stock had no fair market value, we think the *190 restriction against its sale had a substantial depressant effect offset to a minor extent by the assurance of continuity of interest on the part of the major stockholders. Particularly is this true in view of the highly speculative character of the investment. ; . After careful consideration of all the facts presented by the stipulation, transcript of testimony, and exhibits, we have found as a fact that as of July 29, 1949, the 2,000 shares of Community stock acquired by petitioner on that date had no fair market value in excess of $50 per share. Decision will be entered under Rule 50.